UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                      :
BUDD LARNER, P.C.,                                    :        **COMPLAINT**
                                                      :
                                                      :        **Civil Action**
                          Plaintiff,                  :
                                                      :        Case No.
        v.                                            :
                                                      :        19 CV 01720
ROCCO ROMEO and JACQUELINE                            :
GALLER a/k/a/ STAR GALLER ,                           :
                                                      :
                                                      :
                          Defendants.                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - x

        Plaintiff BUDD LARNER, P.C. by way of its Complaint against Defendants

ROCCO ROMEO and JACQUELINE GALLER a/k/a STAR GALLER, alleges as follows:

### NATURE OF THIS ACTION

        This is an action seeking equitable and legal relief based on the fraudulent transfer

of over $1,000,000 of a law firm's revenues by its former Director of Information

Technology, Rocco Romeo, and his co-conspirator, Jacqueline (Star) Galler from 2013 to

2018.   Through a series of fraudulent invoices for supposedly-outsourced IT services,

Romeo siphoned the law firm's revenues to shell companies in California, New Mexico,

and Canada.   Romeo and Gellar – who have significant personal contacts – then

redirected the Firm's monies through the shell companies and into Romeo's and Galler's

separate accounts through PayPal, WePay, and wire transfers; withdrawing cash from these accounts at ATMs, and with Gellar transferring monies from her Chase bank account to Romeo's Chase account.

Defendants each reside in the State of New York within this District.  Defendants' criminal acts are the subject of a Complaint filed by the United States Attorney for the Southern District of New York based on the findings of federal investigators.

## THE PARTIES

1.     Plaintiff Budd Larner, P.C. (the "Firm"), is a law firm incorporated in New Jersey with its principal place of business in Short Hills, New Jersey.

2.     Defendant Rocco Romeo is a resident of the State of New York residing at 3 Paul Court, Washingtonville, NY 10992-2300

3.     Defendant Jacqueline Galler a/k/a Star Galler is a resident of the State of New York residing at 2 Pine Hill Road, Sugar Loaf, NY 10981.

## JURISDICTION & VENUE

4.     This Court has personal jurisdiction over Romeo and Galler under as they are residents of the State of New York within this District.

5.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 as Plaintiff resides in New Jersey and Defendants are each residents of New York; and the amount in controversy exceeds the statutory threshold.  This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1367, because Plaintiff asserts federal civil RICO claims under 18 U.S.C. § 1961, *et seq.*, and all other asserted claims arise out of the same alleged acts by Defendants.

6.     This action is properly venued in the Southern District of New York pursuant to 28 U.S.C. § 1391(b), as both Defendants are residents of New York State.

## FACTS COMMON TO ALL COUNTS

7.     From 2000 through February 2019, Romeo was employed by the Firm as its chief Information Technology officer.

8.     In that capacity, Romeo was solely responsible for overseeing the Firm's information technology ("IT") systems, including Firm billing, time entry, and accounting software; supervising other IT employees in his department; and approving IT expenditures for purchases and services to benefit the Firm.

9.     Romeo had authority to execute contracts on behalf of the Firm with outside IT vendors.

10.     The Firm issued Romeo a corporate credit card in the Firm's name, with which he could pay for services rendered to the Firm by its outside IT vendors.

11.     Romeo had authority to receive invoices from the Firm's outside technology vendors and submit them to the Firm's accounting department for payment.

12.     The Federal Bureau of Investigation conducted a review in 2018 and 2019 of Romeo's and Galler's accounts, activities, prior creation of purported information technology companies, and personal interactions.   The FBI also reviewed records it requested the Firm to provide, showing invoices and payment histories related to Romeo's use of a Firm credit card and Firm monies to pay for purported outside IT services and equipment.

13.     The FBI's findings were summarized in a report attached as **Exhibit A** to this Complaint, charging Romeo and Galler with wire fraud, money laundering, and conspiracy.   The criminal complaint led to this Court's issuance of an arrest warrant for Romeo and Galler.   Romeo was arrested in early February 2016.

## The Blueprints for Romeo's and Galler's Criminal Enterprise

14.     In or about December 2013, Romeo purportedly engaged the firm of Arroteck Solutions to provide technology related goods and services to Budd Larner.

15.     During the period December 2013 through January 2015, the Firm received invoices from Arroteck for IT services and equipment that Romeo claimed had been provided to the Firm.

16.     At Romeo's direction, the Firm paid Arroteck at least $126,357 for IT services and equipment that the Firm never actually received.

17.     Arroteck was incorporated and owned by Romeo.

18.     Starting in August 2015, Romeo and Galler created a series of like-named shell corporations including S7eventech, seven.tech, and S7 Technotech, LLC (collectively, "Seventech").

19.     From August 2015 through December 2018 Romeo 'retained' Seventech to provide IT services and equipment to the Firm.

20.     Romeo created fraudulent invoices in Seventech's name, and then paid these invoices with the Firm's money by charging the costs to Romeo's Firm-issued corporate credit card.

21.     Though the Firm asked Romeo to provide monthly invoices for all IT payments made with his Firm card, and to itemize these statements, Romeo frequently did not provide the monthly statements, itemization, or either.

22.     The Firm's paid Seventech at least $902,147 from 2015 to 2018 at Romeo's direction, with the use of Romeo's Firm-issued credit card.

23.     Seventech's invoices contained charges for services such as data center hosting, VPN provision, and backup solutions. The Firm, however, already obtained these services through a dedicated data center and agreements with another web services provider, and was thus being double billed for IT services.

24.     Seventech's invoices also contained charges for Amazon Web Services (AWS) that were part of payments to Seventech made with Romeo's Firm credit card. The Firm was simultaneously directly paying AWS for the same services and equipment.

25.     The Firm did not receive any IT services or equipment detailed on the Seventech invoices provided by Romeo.

26.     Romeo represented to the Firm that Seventech comprised various Silicon Valley technology company employees who had non-disclosure agreements with their employers.  Thus, Romeo explained, all communications between the Firm and Seventech had to go through him.

27.     In 2018, the Firm's Chief Operating Officer, Mitchell Rait, met with Romeo to for a standard review of the Firm's IT expenses.  Rait grew suspicious when Romeo (i) inconsistently described Seventech (in the same conversation) first as numerous

consultants – and then as a vendor – and then as various Silicon Valley executives; and then (ii) could not produce a W-9 from Seventech for three months after being asked.

28.     The Firm reviewed its financial records, hired a private investigator, and notified federal authorities of its concerns about the legitimacy of Romeo's IT payments and the companies supposedly providing the Firm with IT services.

29.     The FBI's investigation ensued, as did the United States Attorney's commencement of criminal proceedings against Romeo and Galler.

### The Mechanics of Romeo's and Galler's Money Laundering and Wire Fraud

30.     The FBI's investigation revealed how Romeo and Galler used fictitious shell companies to divert Firm monies through these shell accounts – across state and even international borders – through a series of wire transfers from banks to remittance accounts (*e.g.*, PayPal) to their own bank accounts.  Romeo and Galler used the Firm's rerouted monies for their own personal expenses and cash withdrawals.

31.     Romeo and Galler used Seventech to invoice the Firm in two manners:

32.     At times, Romeo and Galler used FreshBooks, a cloud-based accounting service that electronically transmits invoices.  Seventech sent FreshBooks invoices directly to Romeo, who then provided them to the Company only upon request.

33.     Seventech sometimes invoiced the Firm through PayPal, a California entity that generates requests for payment from other PayPal users.  Seventech sent PayPal requests for payment directly to Romeo's PayPal account; and Romeo paid them with his Firm credit card.

34.     The invoices from FreshBooks list the address for Seventech, also stylized as S7eventech and seven.tech, as 733 Third Avenue, 15th Floor, New York, New York, 10017.  The landlord at that address stated he had never heard of any such companies or tenants when contacted by the FBI.

35.     Seventech invoices show charges for services such as data center hosting, VPN provision, and backup solutions. The Firm was already receiving and paying for these services through another web services provider.

36.     The FBI reviewed financial records from PayPal, WePay, JP Morgan Chase, Citibank, Capital One, and the Firm; and account records from Optimum Online and Charter Communications.

37.     Galler opened a subject JP Morgan Chase account in August 2015 in the corporate name of "S7 technotech LLC."

38.     Romeo and Galler laundered the Firm's money in various ways: If Romeo used the Firm credit card to pay invoices from FreshBooks, the Firm's payment first went

to WePay, a credit card processing company headquartered in San Jose, California. WePay has a Seventech account registered to Galler.

39.     Galler then transferred the WePay account monies to her 2015 JP Morgan Chase Seventech account. WePay records show that an IP address registered to Galler at an address in Sugar Loaf, New York accessed Seventech's WePay account several times in October 2018 alone.

40.     After money arrived in the JP Morgan Chase account, Galler distributed the funds in three principal ways. First, Galler made cash withdrawals at ATMs located in Orange County, New York. Second, Galler made online payments to a credit card issued in her name. Third, Galler made electronic transfers to a Chase account owned by Romeo.

41.     If Romeo paid Seventech invoices with PayPal, the monies went to a Seventech PayPal account registered to Galler, using email address "sales@s7eventech.com." IP address information from PayPal shows that an IP address registered to Galler at 2 Pine Hill Road, Sugar Loaf, New York accessed Seventech's PayPal account several times in 2018.

42.     After Romeo paid the fraudulent invoice from PayPal, the funds were temporarily placed in Galler's own PayPal account. Galler then used these funds to pay personal expenses or transmitted the funds to Romeo's personal PayPal account.

9

43.     Beyond the concerted efforts to divert monies from the Firm to their own accounts, Romeo and Gellar were found by the FBI to have numerous and systemic, including Romeo being seen leaving Galler's residence; Romeo using his Firm phone to exchange text messages and phone calls with Galler; Romeo providing website services (through a company registered at his New York State home address) for a New York State yarn business owned by Galler; and Romeo opening fiber line and internet accounts at Galler's home address – and paying for them with the Firm's money.

44.     The Seventech invoices provided to the Firm by Romeo curiously did not include a phone number.  The statement of Romeo's credit card payments to Seventech contained one entry with a phone number.  A Google search revealed that New York number was registered to Jacqueline Galler.

45.     The Firm wished to terminate Romeo's employment in late 2018 as the FBI's findings came to light.  The FBI advised the Firm to wait until the investigation into Romeo and Galler was complete.

46.     Based on its findings, the FBI filed a Complaint in this Court.  The Hon. Lisa Margaret Smith, U.S.M.J. approved an arrest warrant for Romeo and Galler on January 31, 2019.   Federal agents arrested Romeo on February 6, 2019.

47.     The Firm terminated Romeo's employment on the same date.

# COUNT ONE
[Civil RICO]

48.     Plaintiff repeats and incorporates the allegations in the preceding paragraphs.

49.     By fraudulently diverting funds from the Firm to Galler, directly and/or via the S7eventech Entities, and Arrowteck, Romeo was associated in fact with Galler.

50.     As individuals associated in fact with respect to the unauthorized conversion, transfer, receipt, and disposition of the Firm's money, Romeo and Galler formed an enterprise within the meaning of 18 U.S.C. § 1961.

51.     Romeo and Galler participated directly or indirectly in the affairs of the enterprise.

52.     Romeo and Galler individually and collectively participated in the operation, supervision, and/or management of the enterprise.

53.     As an identifiable group of individuals, Romeo and Galler constitute an ascertainable structure within the meaning of the judicial interpretation of 18 U.S.C. § 1961, *et seq.*

54.     Romeo and Galler, by converting, fraudulently misappropriating, stealing, receiving, and retaining money belonging to the Firm, collectively, intentionally, and

knowingly committed more than one act indictable under 18 U.S.C. §§ 1343, 1349, and 1956, each constituting a racketeering activity within the meaning of 18 U.S.C. § 1961.

55.    Romeo and Galler engaged in a pattern of racketeering activity by performing at least two acts of racketeering activity within the meaning of 18 U.S.C. § 1961, the last of which occurred no more than ten years after the first.

56.    The predicate acts giving rise to the pattern of racketeering activity were each related to Defendants' ongoing pattern of theft, fraud, misappropriation, unlawful receipt, and conversion of the Firm's money, and continued for a period from at least 2013 through 2018.

57.    The Firm suffered significant financial losses as a result of Defendants' ongoing pattern of theft, unlawful receipt, and conversion of the Firm's money.

58.    Romeo and Galler's pattern of racketeering activity proximately caused damage to the Firm through the negative financial impact stemming from Defendants' theft, conversion, and misappropriation of the Firm's monies.

**COUNT TWO**
[Fraud]

59.    Plaintiff repeats and incorporates the allegations in the preceding paragraphs.

60.     Romeo made misrepresentations of fact to the Firm when he claimed that he was using the Firm's corporate credit card to pay for legitimate IT services provided to the Firm by outside vendors.

61.     Romeo made further misrepresentations of fact to the Firm when he fashioned fake invoices from Seventech and Arroteck and presented them to the Firm to support his expenditure of Firm monies for the IT services purportedly provided by these supposed entities.

62.     Romeo knew these misrepresentations of fact to be false.

63.     Romeo made these misrepresentations to induce the Firm's reliance.

64.     The Firm's reliance upon these misrepresentations of fact was justifiable.

65.     Plaintiffs suffered money damages resulting from Romeo's misrepresentations in a sum to be determined at trial, but no less than $902,147.

<u>**COUNT THREE**</u>
[Conversion]

66.     Plaintiff repeats and incorporates the allegations in the preceding paragraphs.

67.     Plaintiff has a superior right of possession to its funds.

13

68.     Romeo and Galler intentionally exercised unauthorized dominion over the Firm's funds to the exclusion of the Firm's rights to those same monies.

69.     Romeo and Galler are liable for all damages caused to the Firm resulting from the conversions in an amount to be determined at trial, but no less than $902,000.

## **COUNT FOUR**
[Unjust Enrichment]

70.     Plaintiff repeats and incorporates the allegations in the preceding paragraphs.

*71.*     Defendants have diverted funds from, incurred unauthorized credit card charges to, and converted the monies of the Firm.

*72.*     Defendants accepted the benefits of their conversions and diversions.

*73.*     Romeo and Galler have failed to make restitution for the illegally diverted Firm monies they received.

74.     Plaintiffs suffered money damages resulting from Defendants' conversion and diversions in a sum to be determined at trial, but no less than $902,000.

## COUNT FIVE
[Constructive Trust]

75.     Plaintiff repeats and incorporates the allegations in the preceding paragraphs.

76.     The Firm's entrustment of Romeo to use Firm monies to pay for outside IT services and equipment created a confidential or fiduciary relationship between them.

77.     Romeo represented to the Firm, in the form of a promise, that his Firm credit card expenses and invoices submitted to the Firm's accounting department, were for legitimate IT services and equipment.

78.     The Firm transferred monies from 2013 to 2018 in reliance upon Romeo's representation that Arroteck and Seventech had actually provided the firm with IT services and equipment.

79.     Romeo and Galler were unjustly enriched by this fraudulent diversion of the Firm's monies, which in reality were entirely used by Romeo and Galler to pay for personal expenses, and never used to pay for IT services for the Firm.

80.     Romeo and Galler acquired the Firm's monies in a manner that does not permit them, in good conscience, to retain the beneficial interest in those monies, whether in the actual possession of Romeo and Galler, or in bank accounts and electronic remittance accounts in their names or over which they have control.

81.     Instead, these circumstances justify the imposition of a constructive trust to retain these monies pending disposition of this action.

## COUNT SIX
[Accounting]

82.     Plaintiff repeats and incorporates the allegations in the preceding paragraphs.

83.     Romeo and the Firm had relations of a mutual and confidential nature.

84.     The Firm entrusted money (and the discretion to spend it) to Romeo in his capacity as Director of Information Technology, thereby creating a fiduciary duty.

85.     The Firm is aware of some, but not all, payments made by Romeo using Firm monies to the fraudulent IT companies.   Likewise, the Firm has some, but not all, of the fraudulent invoices submitted by Romeo to the Firm to justify these payments.  The Firm cannot fully account for the disposition of its revenues in this regard for a six-calendar year period which, among other things, makes it impossible for the Firm to amend, if necessary, its reporting to federal and state taxation authorities that previously included these amounts as Firm expenditures.

86.     The Firm is entitled to an accounting of where its monies went from 2013 to 2018, originally represented to be for outside IT services paid for by Romeo through use of his Firm corporate credit card.

16

87.    There is no adequate legal remedy.

**COUNT SEVEN**
[Preliminary Injunction]

88.    Plaintiff repeats and incorporates the allegations in the preceding paragraphs.

89.    There is a likelihood that Plaintiffs' claims against Romeo and Galler for fraud, unjust enrichment, conversion, and civil RICO will succeed on the merits.

90.    Romeo and Galler's illegal diversion of the Firm's assets has irreparably harmed, and continues to irreparably harm, the Firm.

91.    The Firm has no adequate remedy at law to redress the irreparable harm that they have suffered, and continue to suffer, as a result of Romeo and Galler's actions, to the extent they prevent the Firm from fully accounting for or reporting and meeting the Firm's tax obligations related the monies diverted by Defendants.

92.    The balancing of the equities upon the issuance of a preliminary injunction favors the Firm.

93.    By reason of the foregoing, Plaintiffs are entitled to a preliminary injunction enjoining Romeo and Gellar from accessing, diverting, or disposing of assets contained in any commercial bank account (*e.g.* Chase) or electronic remittance account (*e.g.*,

PayPal) that is or was associated with the Firm's monies that were diverted to Seventech and/or Arroteck.

## PRAYER FOR RELIEF

**WHEREFORE,** based on all the foregoing, Plaintiff demands judgment against Defendants as follows:

i.    On the First Cause of Action for violations of 18 U.S.C. § 1961 (civil RICO), Plaintiff requests judgment in their favor and against Romeo and Galler pursuant to 18 U.S.C. § 1964 for three times the amount of Plaintiff's compensatory damages, in an amount to be proven at trial but no less than $902,147 before trebling;

ii.   On the Second Cause of Action for Defendants' fraud, money damages in an amount to be determined at a trial of this action, but no less than $902,147;

iii.  On the Third Cause of Action for Defendants' conversion, money damages in an amount to be determined at a trial of this action, but no less than $902,147;

iv.   On the Fourth Cause of Action for Defendants' unjust enrichment, money damages in an amount to be determined at a trial of this action, but no less than $902,147;

v.    On the Fifth Cause of an Action for the imposition of a constructive trust to take possession of all remaining monies in Romeo's and Gellar's possession, including but not limited to the full amounts in commercial bank accounts and online remittance accounts that at any time contained the Firm's monies used to pay for fraudulent IT services or to entities created by Romeo or Gellar;

vi.   On the Sixth Cause of Action for an accounting of all Firm monies paid by Romeo to all fictitious IT entities created by Romeo or Gellar; or all entities that did not provide actual IT services to the Firm;

vii.   On the Eleventh Cause of Action for a preliminary injunction enjoining and restraining Romeo and Gellar from (a) obtaining, possessing, transferring, and using assets, monies, or items of value obtained by the illegal use of the Firm's money, including but not limited to Romeo's and Gellar's accounts that at any time contained Firm monies misappropriated by Defendants; and

viii.   Pre-judgment interest, attorneys' fees, costs, and disbursements, and such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a trial by jury as to all issues.

## CERTIFICATION PURSUANT TO L. CIV. R. 83.10(d)(3)(A)

The amount in controversy in this action exceeds $150,000.00, exclusive of interest and costs, and should thus not be referred to arbitration.

Dated: New York, New York
      **February 22, 2019**

BUDD LARNER, P.C.
*Attorneys for Plaintiff*

By:

PHILIP C. CHRONAKIS

260 Madison Avenue, 18th Floor
New York, NY 10016
PChronakis@BuddLarner.com
Tel:  212.455.0436

# EXHIBIT A

Approved: _____
          Mathew S. Andrews
          Assistant United States Attorney

**ORIGINAL**

Before:   HONORABLE LISA MARGARET SMITH
          United States Magistrate Judge
          Southern District of New York

- - - - - - - - - - - - - - - - - - - X

                                      :      19 mag 1009
UNITED STATES OF AMERICA              :      **SEALED COMPLAINT**
                                      :
     - v. -                           :      Violations of
                                      :      18 U.S.C. §§ 2,
                                      :      1343, 1349, 1956
ROCCO ROMEO,                          :
JACQUELINE GALLER,                    :      COUNTY OF OFFENSE:
a/k/a STAR GALLER,                    :      Orange
                    Defendants.       :
                                      :
- - - - - - - - - - - - - - - - - - - X

SOUTHERN DISTRICT OF NEW YORK, ss.:

        MARISSA TUOHY, being duly sworn, deposes and says that
she is a Special Agent with the Federal Bureau of Investigation,
and charges as follows:

**COUNT ONE**
(Conspiracy to Commit Wire Fraud)

        1.   From at least in or about August 2015, up to and
including at least in or about December 2018, in the Southern
District of New York and elsewhere, ROCCO ROMEO and JACQUELINE
GALLER, a/k/a STAR GALLER, the defendants, and others known and
unknown, willfully and knowingly, did combine, conspire,
confederate, and agree together and with each other to commit
wire fraud, in violation of Title 18, United States Code,
Section 1343.

2.   It was a part and object of the conspiracy that ROCCO ROMEO and JACQUELINE GALLER, a/k/a STAR GALLER, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, ROMEO and GALLER submitted nearly $900,000 in false and fraudulent invoices to ROMEO's New Jersey-based employer (the "Company") for alleged information technology ("IT") services, when in reality ROMEO and GALLER were syphoning these funds into personal accounts, in violation of Title 18 United States Code, Section 1343.

(Title 18, United States Code, Sections 1349 and 2.)

### COUNT TWO
(Wire Fraud)

3.   From at least in or about August 2015, up to and including at least in or about December 2018, in the Southern District of New York and elsewhere, ROCCO ROMEO and JACQUELINE GALLER, a/k/a STAR GALLER, the defendants, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, ROMEO and GALLER submitted nearly $900,000 in false and fraudulent invoices to ROMEO's New Jersey-based employer (the "Company") for alleged information technology ("IT") services, when in reality ROMEO and GALLER were syphoning these funds into personal accounts, in violation of Title 18 United States Code, Section 1343.

(Title 18, United States Code, Sections 1343 and 2.)

### COUNT THREE
(Conspiracy to Commit Money Laundering)

4.   From at least in or about August 2015, up to and including at least in or about December 2018, in the Southern

2

District of New York and elsewhere, ROCCO ROMEO and JACQUELINE
GALLER, a/k/a STAR GALLER, the defendants, and others known and
unknown, willfully and knowingly, did combine, conspire,
confederate, and agree together and with each other to commit
money laundering, in violation of Title 18, United States Code,
Sections 1956(a)(1)(A)(i) and (B)(i).

     5.    It was a part and an object of the conspiracy
that ROCCO ROMEO and JACQUELINE GALLER, a/k/a STAR GALLER, the
defendants, and others known and unknown, in an offense
involving and affecting interstate and foreign commerce, knowing
that the property involved in a financial transaction
represented the proceeds of some form of unlawful activity,
would and did knowingly conduct and attempt to conduct such a
financial transaction which in fact involved the proceeds of
specified unlawful activity, to wit, the wire fraud conspiracy
charged in Count One of this Complaint, with the intent to
promote the carrying on of that specified unlawful activity.

     6.    It was further a part and an object of the
conspiracy that ROCCO ROMEO and JACQUELINE GALLER, a/k/a STAR
GALLER, the defendants, and others known and unknown, in an
offense involving and affecting interstate and foreign commerce,
knowing that the property involved in a financial transaction
represented the proceeds of some form of unlawful activity,
would and did knowingly conduct and attempt to conduct such a
financial transaction which in fact involved the proceeds of
specified unlawful activity, to wit, the wire fraud conspiracy
charged in Count One of this Complaint, knowing that the
transaction was designed in whole and in part to conceal or
disguise the nature, the location, the source, the ownership, or
the control of the proceeds of that specified unlawful activity.

    (Title 18, United States Code, Section 1956(h))

### COUNT FOUR
(Money Laundering)

     7.    From at least in or about August 2015, up to and
including at least in or about December 2018, in the Southern
District of New York and elsewhere, ROCCO ROMEO and JACQUELINE
GALLER, a/k/a STAR GALLER, the defendants, and others known and
unknown, knowing that the property involved in a financial
transaction represented the proceeds of some form of unlawful
activity, did willfully and knowingly, conduct and attempt to
conduct such a financial transaction which in fact involved the
proceeds of specified unlawful activity, (a) with the intent to

3

promote the carrying on of specified unlawful activity; and (b) knowing that the transaction was designed, in whole or in part, to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, to wit, after receiving the proceeds of the wire fraud into accounts at two credit card processing companies registered to fictitious companies and a shell corporation, ROMEO and GALLER then transferred the funds either to personal accounts or to a bank account registered to a shell corporation that they incorporated and controlled. They then used the funds from the shell corporation's bank account to pay credit card bills and make deposits in accounts in their own names.

(Title 18, United States Code, Sections 1956(a)(1)(A)(i), (B)(i), and 2.)

The bases for my knowledge and for the foregoing charges are, in part, as follows:

8. I am a Special Agent with the Federal Bureau of Investigation. I have been personally involved in the investigation of this matter, and I base this affidavit on that experience, on my conversations with other law enforcement officials and others, my examination of various reports and records, and physical surveillance. Because this affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

## Overview

9. Based on my investigation of this matter, and as set forth more fully below, from at least in or about August 2015, up to and including at least in or about December 2018, in the Southern District of New York and elsewhere, ROCCO ROMEO and JACQUELINE GALLER, a/k/a STAR GALLER, the defendants, and others known and unknown, planned and executed a fraudulent scheme whereby ROMEO and GALLER incorporated a shell company known as S7 TECHNOTECH LLC and used the company to bill nearly $900,000 of expenses to ROMEO's employer, the Company, using false charges and invoices. Specifically, ROMEO and GALLER used entities located in Canada and California to generate fraudulent invoices and sent them electronically to the Company's headquarters in New Jersey. ROMEO, who was the head of the

4

Company's IT Department, paid the fraudulent invoices using his Company credit card, after which the proceeds went into accounts at two credit card processing companies registered either to fictitious companies—S7EVENTECH and SEVEN.TECH—or a shell corporation—S7 TECHNOTECH LLC. ROMEO and GALLER then transferred the funds from these accounts to personal accounts or to a bank account registered to the shell corporation that they incorporated and controlled. ROMEO and GALLER afterwards used the funds to pay personal expenses.

## The Investigation

10.   Based on conversations with a representative of ROMEO's employer (the "Company") and my review of documents provided by the Company, I have learned, among other things, the following:

a.   In the summer of 2018, the Company performed a cost review by business unit and found excessive spending by the Information Technology ("IT") Department, headed by ROCCO ROMEO, the defendant. The Company maintains its headquarters and IT Department in New Jersey.

b.   A breakdown of IT costs by vendor revealed almost $900,000 in charges to a firm called SEVENTECH between August 2015 and December 2018. SEVENTECH also listed its name on invoices as S7EVENTECH or SEVEN.TECH.

c.   SEVENTECH invoiced the Company using several methods. It first used a company known as FreshBooks, which is located in Canada and sells cloud-based accounting services. Users transmit invoices through FreshBooks by creating an account and sending invoices to recipients electronically. SEVENTECH sent FreshBooks invoices directly to ROMEO, who then provided them to the Company only upon request.

d.   In other instances, SEVENTECH invoiced the Company using a third party credit card processor, PayPal, which is headquartered in San Jose, California. Users send invoices through PayPal by creating an account and sending "requests for payment" to other PayPal users. SEVENTECH sent PayPal requests for payment directly to ROMEO.

e.   SEVENTECH invoices show charges for services such as data center hosting, VPN provision, and backup solutions. The Company, however, already obtains these services

through a dedicated data center and agreements with another web services provider.

f.   The Company interviewed ROMEO as part of the cost review. ROMEO represented to the Company, in sum and substance, that SEVENTECH is comprised of former Silicon Valley technology company employees who are operating under (and potentially violating) non-disclosure agreements with their former employers. ROMEO further represented that as a result, all communications with SEVENTECH must go through him.

11.   Based on my review of documents provided by the Company, my discussions with other law enforcement officers, and open source information, I have learned, among other things, the following:

a.   The invoices from FreshBooks list the address for SEVENTECH, also stylized as S7EVENTECH and SEVEN.TECH, as 733 Third Avenue, 15th Floor, New York, New York, 10017.

b.   The company located at 733 Third Avenue, 15th Floor, New York, New York, 10017 rents temporary office space to businesses.

c.   A law enforcement officer contacted the company located at 733 Third Avenue, 15th Floor, New York, New York, 10017 and spoke to a representative. The representative stated, in sum and substance, that he has worked for the company for five years in customer service operations and that he did not recognize the names S7EVENTECH, SEVENTECH, or SEVEN.TECH.

12.   Based on my review of financial records from PayPal, WePay, JP Morgan Chase, Citibank, Capital One, and account records from Optimum Online and Charter Communications, I have learned, among other things, the following:

a.   Each month, ROCCO ROMEO, the defendant, paid SEVENTECH's invoices using his Company credit card.[1] Payments from ROMEO then took two different routes to SEVENTECH depending on whether the invoice was from FreshBooks or PayPal.

---

[1] The Company pays ROMEO's Company credit card using money from its own financial accounts.

6

b.    If the invoice was from FreshBooks, the payment first went to WePay, a credit card processing company headquartered in San Jose, California. WePay has a SEVENTECH account registered to JACQUELINE GALLER, a/k/a STAR GALLER,[2] the defendant, using email address "sales@s7eventech.com."

c.    After the funds arrived in SEVENTECH's WePay account, they were transferred to an account at JP Morgan Chase. IP address information from WePay shows that an IP address registered to GALLER at an address in Sugar Loaf, New York accessed SEVENTECH's WePay account several times in October 2018.

d.    Bank records further show that GALLER opened the subject JP Morgan Chase account in August 2015 in the corporate name of "S7 TECHNOTECH LLC."

e.    After money arrived in the JP Morgan Chase account, GALLER distributed the funds in three principal ways. First, GALLER or other unidentified persons made cash withdrawals at ATMs located in Orange County, New York. Second, GALLER made online payments to a credit card issued in her name. Third, GALLER made electronic transfers to a Chase bank account owned by ROMEO.

f.    Charges on GALLER's credit card do not reflect payments to alleged "former Silicon Valley technology company employees." Likewise, ROMEO used funds in his Chase bank account to pay personal expenses.

g.    ROMEO's payments to SEVENTECH through PayPal follow a similar pattern.

h.    PayPal, like WePay, has a SEVENTECH account registered to GALLER, using email address "sales@s7eventech.com." IP address information from PayPal shows that an IP address registered to GALLER at 2 Pine Hill Road, Sugar Loaf, New York accessed SEVENTECH's PayPal account several times in 2018.

i.    After ROMEO paid the fraudulent invoice from PayPal, the funds were temporarily placed in GALLER's PayPal account. GALLER then used these funds to pay personal expenses or transmitted the funds to a PayPal account owned and operated

_____

[2] The WePay account is registered to the name STAR GALLER rather than JACQUELINE GALLER.

by ROMEO. ROMEO used the funds transmitted to his PayPal account to pay a credit card issued in his name for personal expenses.

13. Based on conversations with an employee at the Company, my review of toll records, my review of open source information, and my own physical surveillance, I have learned that ROMEO and GALLER have had extensive personal dealings. In particular, I have learned:

a. JACQUELINE GALLER, a/k/a STAR GALLER, the defendant, owns Galler Yarns, a yarn shop in Monroe, New York, and lives in Sugar Loaf, New York. Galler Yarns' website was designed and hosted by RFORCE SOLUTIONS LLC ("RFORCE").

b. ROCCO ROMEO, the defendant, has used the email address rromeo@rforcesolutions.com. RFORCE's articles of incorporation, filed with New York state, further list one of RFORCE's addresses as located at ROMEO's home address.

c. Cellphone records further show calls, texts, and picture messages, some at midnight or later, between cell phone number ending -3004 and cell phone number ending -3355. The subscriber for cell phone number -3004 is a yarn business that shares an address with Galler Yarns. Based on information from the Company, ROMEO uses the number -3355 as his corporate cell phone.

d. ROMEO and GALLER have further had personal contact. On the morning of January 7, 2019, law enforcement observed ROMEO, who lives in Washingtonville, New York, leaving GALLER's place of residence in Sugar Loaf, New York.

14. Based on my review of financial records from PayPal and WePay, I have learned, among other things, the following:

a. NameSilo LLC, an anonymous domain registrar, registered "s7eventech.com" on August 15, 2015. The day before, on August 14, 2015, ROCCO ROMEO, the defendant, received a $150 charge from NameSilo LLC on his PayPal account.

b. From August 2015 to December 2018, the only invoices sent by SEVENTECH using the credit card processors described above were to the Company.

WHEREFORE, I respectfully request that a warrant be issued for the arrest of ROCCO ROMEO and JACQUELINE GALLER,

8

a/k/a STAR GALLER, the defendants, and that they be arrested and
imprisoned or bailed, as the case may be.

MARISSA TUOHY
Special Agent
Federal Bureau of Investigation

Sworn to before me this
31st day of January 2019

HONORABLE LISA MARGARET SMITH
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

9